IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RICHARD UNANGST : | |
| : | CIVIL ACTION |
| v. : | |
| : | NO. 10-6811 |
| DUAL TEMP COMPANY, INC., ET AL. : | |

### MEMORANDUM

**SURRICK, J.**                                                                                           **MARCH  19 , 2012**

Presently before the Court is Defendants Dual Temp Company, Inc., Kevin Keeler and Paul Bjorke's Motion for Summary Judgment. (Defs.' Mot. Summ. J., ECF No. 14.) For the following reasons, the Motion will be granted.

**I.     BACKGROUND**

In the fall of 2008, Plaintiff Richard Unangst was diagnosed with non-Hodgkin's lymphoma, a form of cancer. (Compl. ¶ 22, ECF No. 1.) At the time, Plaintiff was employed as a heating, ventilation and air conditioning (HVAC) service technician for Defendant Dual Temp Company, Inc. ("Dual Temp"), a corporation based in Allentown, Pennsylvania. (*Id*. at ¶ 17.) Plaintiff was responsible for repairing and servicing existing HVAC systems for clients, often traveling to off-campus sites. (Bjorke Dep. 66, 85-88, Defs.' Mot. Summ. J. Ex. B.)[1]

Plaintiff had been employed by Dual Temp since May 2008, having been hired because of his experience and knowledge. (Compl. ¶ 17; Keeler Dep. 30, Pl.'s Resp. Ex. 2, ECF No. 15.)

---

[1] Plaintiff and Defendants have submitted different excerpts from the various deposition testimony in this case. When we refer to a specific page in the deposition testimony, we will refer to the deposition submitted by Defendant. We will specifically note when we refer to a page which only Plaintiff has included in his exhibits.

His direct supervisor during the six months between the commencement of his employment at Dual Temp and his cancer diagnosis was Defendant Kevin Keeler.  (Compl. ¶ 18.)  Keeler was employed as the service manager at Dual Temp.  (*Id*. at ¶ 11; Keeler Dep. 9, Defs.' Mot. Summ. J. Ex. A.)  Defendant Bjorke was employed as Dual Temp's human resources and safety manager.  (Compl. ¶ 12; Bjorke Dep. 12.)

Prior to his diagnosis, Plaintiff's on-the-job performance was called into question on several occasions.  In June 2008, Keeler expressed concern to Bjorke about Plaintiff's productivity and e-mailed Bjorke to recount a conversation Keeler had had with Plaintiff.  That e-mail memorializes Keeler's sense that Plaintiff "has been performing below expectations when he is left by himself," and Plaintiff's "frustrations with [Keeler]" and the pace and level of work expected of Plaintiff.  (June 19 E-mail, Defs.' Mot. Summ. J. Ex. C-9.)  Several months later, in September 2008, Keeler e-mailed Bjorke to describe another conversation between Keeler and Plaintiff.  In that e-mail, Keeler pointed to "shortcomings in [Plaintiff's] troubleshooting skills," using two recently mishandled jobs to illustrate the nature of the problem.  (Sept. 23 E-mail, Defs.' Mot. Summ. J. Ex. C-10.)  According to Keeler's second e-mail, Keeler had explained to Plaintiff that Dual Temp "expect[ed] much more from him than [it was] receiving," and was concerned that "[h]is teammates [had] begun rejecting him and . . . stopped assisting him in the field."  (*Id*.)  Keeler concluded by noting that Plaintiff had "been informed that things are not going well," and had been told that "he needs to take corrective action immediately."  (*Id*.)  Plaintiff denies that these conversations occurred, and claims that Keeler never confronted him about poor job performance during his tenure at Dual Temp.  (Unangst Dep. 153-57, Pl.'s Resp.

Ex. 3.)[2]  These two instances were recorded as "Discipline Dates" in a summary of employees' evaluations, which also included negative evaluations of Plaintiff's performance as assessed by Bjorke.  (Defs.' Mot. Summ. J. Ex. C-6; Bjorke Dep. 73-82.)

According to Keeler, Plaintiff was generally a subpar employee, because of his slowness, lack of understanding of "how to run a job," and difficulty working with other team members.  (Keeler Dep. 55.)  Keeler noted specific problems involving Plaintiff's performance on the job sites at "US Cold Storage" and "Kelly Nissan," two Lehigh County businesses.  (*Id*. at 111-12, 114.)

Plaintiff was diagnosed with cancer in late October or early November 2008.  (Unangst Dep. 96, Defs.' Mot. Summ. J. Ex. D.)  Plaintiff informed Dual Temp of his diagnosis on the next workday.  (*Id*.)  According to Plaintiff, Keeler promised to "work with [Plaintiff] in the future . . . to get through to try and accommodate [Plaintiff's] needs."  (*Id*. at 97.)  Keeler and Plaintiff then proceeded to meet with Bjorke, and designed a timetable for Plaintiff to stop working.  (*Id*. at 98-99.)  At that meeting, Plaintiff was advised to take a three-month-long, paid, short-term disability leave.  (*Id*. at 100.)  Plaintiff was not under the impression that his leave would last any longer than three months.  (*Id*. at 103.)

Plaintiff stopped working at Dual Temp and began chemotherapy treatments in November 2008, soon after receiving his diagnosis.  The treatments were administered every two weeks, and left Plaintiff severely fatigued, nauseous and anxious.  (ADA Intake Questionnaire ¶ 4, Defs.' Mot. Summ. J. Ex. E-2.)  Although Plaintiff was on paid disability leave, he stopped by Dual Temp's offices on two occasions:  in late November, to pick up a Thanksgiving turkey

---

[2] When we refer to "Unangst Dep.," we are referring to the deposition of Plaintiff Richard Unangst, not the deposition of his wife, Cindy Unangst.

given to all employees, and again in December.  (Unangst Dep. 104.)  According to Plaintiff, at various times between November 2008 and February 2009, Bjorke inquired as to Plaintiff's wife's employment status, asked whether Plaintiff had a mortgage on his home, and raised other personal financial issues with Plaintiff.  (ADA Intake Questionnaire ¶ 4.)

Plaintiff was found to be cancer-free in February 2009.  (*Id*. at ¶ 2.)  Following his treatment, Plaintiff's physicians placed no restrictions on his ability to resume a normal life and return to work.  (*Id*. at ¶ 8; Doctor's Note, Defs.' Mot. Summ. J. Ex. E-7.)

Plaintiff's absence from Dual Temp coincided with a severe downturn in the American economy, which affected Dual Temp's business.  In early 2009, Dual Temp began to lay off employees, citing a lack of work.  (Bjorke Dep. 65.)  From January 27, 2009 through March 30, 2009, Dual Temp laid off dozens of employees, including five service technicians.  (Defs.' Mot. Summ. J. Ex. C-7.)  A series of memoranda written by Bjorke detail the nature of the layoffs, noting that they were due to "current workforce requirements."  (Defs.' Mot. Summ. J. Ex. C-6.)  On March 9, 2009, Bjorke informed Plaintiff, who had returned to Dual Temp's offices for what he anticipated would be his first day of work, that he would be laid off because there was no work for him.  (*See* Unangst Dep. 111-15.)[3]  According to Bjorke, layoff decisions were made after consultation with project managers and examination of empirical evaluations.  (Bjorke Dep. 61.)

---

[3] Plaintiff believes that he was terminated, not laid off, and that there was never an opportunity for him to be rehired.  (Unangst Dep. 119.)  Defendants point out that of the five service technicians who were released during this period, only one "was ever recalled to work at dual (sic)  Temp, and that was not until December 6, 2010."  (Defs.' Mot. Summ. J. 6.)  Dual Temp's letter informing Plaintiff of his release refers to a "lay-off."  (Release Letter, Defs.' Mot. Summ. J. Ex. E-8.)

On September 3, 2009, Plaintiff filed charges with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Rights Commission ("PHRC"), alleging discrimination by Defendants because of his disability.  On August 2, 2010, the EEOC issued a Notice of Right to Sue.  On November 19, 2010, Plaintiff filed a Complaint, alleging discrimination in violation of the Americans with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA").

Following discovery, Defendants filed the instant Motion for Summary Judgment.  Plaintiff has responded, opposing Defendants' Motion.

## II.     LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").  Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 325 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact is genuinely . . . disputed must support the assertion by . . . citing to particular parts of materials in the record."); *see also Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citations omitted).  When deciding a motion for summary judgment, courts must view facts and inferences in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.  Courts must not resolve factual disputes or make credibility determinations.  *Siegel v. Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## III.    DISCUSSION

Defendants seek summary judgment on all five Counts in Plaintiff's Complaint.  Counts I through IV seek relief solely from Dual Temp; Count V seeks relief from the individual Defendants Keeler and Bjorke.  Count I alleges violations of the ADA, 42 U.S.C. §§ 12101, *et seq*.  (Compl. ¶ 53.)  Count II alleges retaliation against Plaintiff "for exercising his rights under" the ADA.  (*Id*. at ¶ 59.)  Count III alleges violations of the PHRA, 43 Pa. Stat. Ann. §§ 951, *et seq*.[4]  (Compl. ¶ 62.)  Count IV alleges retaliation against Plaintiff for exercising his rights pursuant to the PHRA.  (*Id*. at ¶ 65.)  Count V alleges that Keeler and Bjork aided and abetted discrimination and retaliation in violation of the PHRA.  (*Id*. at ¶ 68.)

---

[4] The Third Circuit has stated that the "analytical framework used to evaluate a disability discrimination claim under the PHRA is effectively indistinguishable from that under the ADA, thus allowing courts to dispose of both ADA and PHRA claims on the same grounds."  *Bialko v. The Quaker Oats Co.*, 434 F. App'x 139, 142 (3d Cir. 2011) (not precedential); *see also Eshelman v. Agere Sys.,* 554 F.3d 426, 433 n.5 (3d Cir. 2009) (limiting discussion to ADA claims because PHRA claims are decided "coterminous[ly]"); *Rineheimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002) (providing for disposition of plaintiff's ADA claim under same rubric as plaintiff's PHRA claim).  We address Plaintiff's claims under the legal framework provided by the ADA based upon the nature of the wrongful conduct alleged by Plaintiff, rather than count by count.

"The ADA prohibits covered employers from discriminating against disabled individuals" on the basis of their disability. *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010); *see also* 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability."). "To establish a prima facie case of discrimination" in violation of the ADA, "a plaintiff must show (1) that he is disabled within the meaning of the ADA, (2) that he is otherwise qualified for the job, with or without reasonable accommodations, and (3) that he was subjected to an adverse employment decision as a result of discrimination." *Sulima*, 602 F.3d at 185 (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)).

    A.    **Plaintiff's Eligibility Under the ADA**

To succeed on his claim that he was discriminated against in violation of the ADA, Plaintiff must first establish that he was disabled as the law defines that term. The ADA provides that an individual has a disability if he has (i) "a physical or mental impairment that substantially limits one or more major life activities of such individual," (ii) "a record of such an impairment," or (iii) is "regarded as having such an impairment." 42 U.S.C. § 12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Furthermore, "an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." *Id*. at § (4)(D). We construe this definition liberally, with an eye towards "broad coverage of individuals under" the ADA. *Id*. at § (4)(A).

It is clear that Plaintiff's condition qualified as a disability in November 2008, and Defendants do not contest this.  The ADA was clearly intended by Congress to protect cancer patients from disability discrimination.  *See* H. Rep. No. 101-485, pt. 3, at 29 (1990).  Cancer is a "paradigmatic example of such an impairment." *Adams v. Rice*, 531 F.3d 936, 952 (D.C. Cir. 2008).  Plaintiff has further demonstrated that his chemotherapy treatment substantially limited his ability to perform major life activities, due largely to the fatigue and nausea he experienced as a result of the treatment.  (Unangst Dep. 137-38; Defs.' Mot. Summ. J. Ex. E-11.)  Plaintiff's cancer diagnosis in late 2008 qualified him for the protections of the ADA at that time.  Plaintiff was cancer-free as of February 2009, and cleared to return to work without restrictions.  (Compl. ¶¶ 29-30.)  However, it is likely that Plaintiff's cancer, while in remission at the time of the alleged adverse employment actions, would substantially limit a major life activity when active.  This entitles Plaintiff to ADA coverage.  *See* 42 U.S.C. § 12102(4)(D).  Clearly, Plaintiff's condition qualifies as a "disability" within the meaning of the ADA.

Plaintiff also bears the burden of proving that he is a "qualified individual" for the purposes of the job in question.  *Shiring v. Runyon*, 90 F.3d 827, 832 (3d Cir. 1996).  The Third Circuit has established a two-prong test for determining whether someone is a qualified individual under the ADA.  First, we must determine whether the individual satisfies the prerequisites for the position, by possessing the appropriate educational background, employment experience, skills and licenses.  Second, we must determine whether the individual can perform the essential functions of the position, with or without reasonable accommodation.  *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).

Plaintiff has established that he is a "qualified individual" within the scope of this definition. Plaintiff has extensive experience as an HVAC specialist. Prior to joining Dual Temp, Plaintiff had been employed for twenty-eight years as an HVAC technician. (Bjorke Dep. 63.) At his deposition, Keeler testified that, when hired, Plaintiff "seemed to have the years of experience and level of job knowledge" needed at the time. (Keeler Dep. 30, Pl.'s Resp. Ex. 2.) Plaintiff meets the first prong of the Third Circuit's test.

As to the second prong, Defendants claim that Plaintiff was unable to do the job required of him, and thus was not necessarily qualified. (Defs.' Mem. 17.) Indeed, they have pointed to two instances which cast doubt on the quality of Plaintiff's work. We will not judge the entire working life of an individual based upon two negative episodes. Moreover, Keeler testified that had it not been for the economic downturn, he would have recommended that Plaintiff return to work. (Keeler Dep. 110.) While Plaintiff seemed to have his share of difficulties, both sides believe that he was able to perform the essential functions of the position. Plaintiff has established that he is a qualified individual with a disability.

### B.     Plaintiff's Termination Claim

Since Plaintiff is a qualified individual with a disability, we must determine whether he can establish that he was discriminated against because of that disability. When a plaintiff lacks direct evidence of discrimination, we utilize the burden-shifting framework found in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of unlawful discrimination or retaliation. *McDonnell Douglas*, 411 U.S. at 802. After the Plaintiff has established a prima facie case of discrimination, the burden of production

9

shifts to the employer to articulate a legitimate and non-discriminatory reason for its decision to terminate the plaintiff. *Id*. Once the employer meets this "relatively light burden," the burden of production returns to the plaintiff, who must show by a preponderance of the evidence that the employer's proffered reason is pretextual. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Plaintiff "must submit evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Id.* at 762.

Dual Temp has provided a legitimate, non-discriminatory reason for its decision to lay off Plaintiff. That reason is the economic downturn.[5] Bjorke testified that between January and March of 2009, the layoffs were the worst he had seen throughout his tenure at Dual Temp. (Bjorke Dep. 65.) As Bjorke explained, the layoffs were so severe because "[t]here wasn't work for" employees to do. (*Id*.) Decisions as to whether employees should be laid off were made on a case-by-case basis, depending on whether work was available. (*Id*. at 66.) Between January and March of 2009, Dual Temp laid off approximately forty employees. This included five of the twelve service technicians employed by Dual Temp, including Plaintiff. (*Id*. at 67-70; *see* Defs.' Mot. Summ. J. Ex. C.)

It is well established that changing business conditions can be a legitimate, non-discriminatory reason for layoffs. *See, e.g.*, *Whack v. Peabody & Wind Eng'g Co.*, 595 F.2d 190 (3d Cir. 1979) (rejecting Title VII claim because plaintiff could not overcome evidence presented

---

[5] We note that Defendants also discuss Plaintiff's performance as a potential reason for his termination. We need not reach this issue, however, because Plaintiff is unable to rebut Defendants' primary reason, which is rooted in Dual Temp's economic struggles.

that termination was result of an economic downturn that drastically reduced defendant company's workforce); *Trapani v. Greatwide Logistics Servs., LLC*, No. 10-334, 2011 U.S. Dist. LEXIS 96658, at *30 (E.D. Pa. Aug. 29, 2011) (determining 2008 recession to be legitimate, non-discriminatory cause of layoffs); *Curtis v. Robern, Inc.*, 819 F. Supp. 451, 453 (E.D. Pa. 1993) (finding that economic downturn was legitimate, non-discriminatory reason for layoffs, although plaintiff overcame presumption and demonstrated pretext); *Powell v. Wilmington Plumbing Supply Co.*, 921 F. Supp. 1264, 1268 (D. Del. 1996) (same).

Plaintiff has offered insufficient evidence to rebut Defendants' legitimate, non-discriminatory reason for laying him off. Defendants have offered considerable evidence to support their claim that Plaintiff's layoff was merely one of many such layoffs, compelled by the economic reality of the times. It is common knowledge that during this time, employers all over the country have had to lay off employees because of the recession.

Plaintiff argues that Defendants' appraisal of Plaintiff's job performance was flawed and motivated by discriminatory animus. However, this does not address the real reason for Defendant's action. Regardless of Plaintiff's job performance, the economy dictated Defendant's decision. Plaintiff has not met his required production burden. Consequently, Plaintiff's claim that his termination was unlawful must fail.

### C. Plaintiff's Failure to Accommodate and "Interactive Process" Claims

Plaintiff also claims that Dual Temp failed to grant reasonable accommodations which would have allowed him to continue working despite his disability. (Compl. ¶ 56.) Plaintiff argues that Dual Temp denied his request that he be exempted from "heavy lifting/strenuous activity" for three to five days after procedures, and instead compelled him to take short-term

disability leave. (Pl.'s Resp. 5-6.) Plaintiff also contends that Dual Temp failed to engage in an "interactive process" to determine the best means of addressing his disability. (*Id*. at 7; Compl. ¶ 41.)

The ADA includes, in its definition of discrimination, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). It is well-established that "refusing to make reasonable accommodations for a plaintiff's disabilities" constitutes proscribed discrimination under the ADA. *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004). "Although the ADA itself does not mention an 'interactive process' with respect to reasonable accommodations," the ADA's regulations require that the "appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability." *Hohider v. UPS*, 574 F.3d 169, 187 (3d Cir. 2009); 29 C.F.R. Pt. 1630, App. § 1630.9 at 359. Such "interactive process" requires nothing more than that "employers make a good-faith effort to seek accommodations." *Hohider*, 574 F.3d at 187.

Plaintiff's argument is rife with contradictions. Plaintiff claims, in his Memorandum in Opposition to Summary Judgment, that short-term disability leave was not the reasonable accommodation that he requested. (Pl.'s Resp. 5-6.) This directly contradicts the averments which Plaintiff makes in his Complaint. Paragraph 25 of Plaintiff's Complaint specifically states that Plaintiff "requested reasonable accommodation in the form of leave for cancer treatment." (Compl. ¶ 25.) In paragraph 56 of his Complaint, Plaintiff again refers to "the requested accommodation in the form of leave for cancer treatment." (*Id*. at ¶ 56.) In fact, Plaintiff told the

EEOC that he took the short term disability leave because he was concerned about how he would react to chemotherapy. (Defs.' Mot. Summ. J. 141-42)

There is more than sufficient evidence to support the claim that Plaintiff requested accommodation in the form of paid short-term disability leave. Plaintiff himself testified to this fact. "It was understood that I was taking a three-month leave," said Plaintiff, noting that he had no concerns or problems with it at the time. (Unangst Dep. 103.) Plaintiff testified that he always understood his claim was for short-term disability. (*Id*. at 102.) According to Plaintiff, the subject of his meeting with Bjorke and Keeler was to "determine how much longer [he] would be able to" work. (*Id*. at 99.) Prior to the filing of his Response to Defendants' Motion for Summary Judgment, Plaintiff himself had never alluded to the possibility of his continuing to work while undergoing chemotherapy.

Dual Temp accommodated Plaintiff with paid short-term disability leave because Plaintiff requested that form of accommodation. Dual Temp did not offer another form of accommodation because Plaintiff "didn't ask for it." (Bjorke Dep. 153.) Rather, Plaintiff asked for, and applied for, paid short-term disability leave in accordance with Dual Temp's procedures for doing so. Dual Temp granted that requested accommodation.

Plaintiff points out that his physician, Dr. Ranju Gupta, completed a section of Plaintiff's request for short-term disability leave. (Defs.' Mot. Summ. J. Ex. E-6.) Gupta wrote, in explaining Plaintiff's condition, that Plaintiff should avoid heavy lifting or strenuous activity for three to five days following specific procedures. (*Id*.) This was a statement of Plaintiff's medical condition, not a specific request for accommodation. Plaintiff argues that we should construe this as an implicit request for that form of accommodation, and not as a request for

short-term disability leave.  Such a construction defies logic and common sense.  It contradicts the weight of Plaintiff's own words and also the clear context in which Gupta's words were written.  Gupta's description of Plaintiff's disability is contained within a request form for paid short-term disability leave that Plaintiff himself filled out and signed.  We will not remove Gupta's statements from the context in which they were made, and ignore the fact that Plaintiff requested only one reasonable accommodation, in the form of short-term disability leave.  He never requested any other form of reasonable accommodation by Dual Temp.  Any claim that he did is entirely unsupported by facts.

We would entertain the possibility that short-term disability leave did not constitute a reasonable accommodation under the ADA, except that again we are confronted by Plaintiff's own averments.  Paragraph 38 of Plaintiff's Complaint states that the "forgoing (sic) leave accommodation was a reasonable accommodation under the ADA."  (Compl. ¶ 38.)  Paragraph 42 states that "Plaintiff's leave request qualified as a reasonable accommodation under the ADA."  (*Id*. at ¶ 42.)  Indeed, the core of Plaintiff's ADA retaliation claim, *see infra* § III.D, is based on the argument that Dual Temp's termination constituted retaliation against him for this requested, reasonable accommodation.

Plaintiff's interactive process claim must also fail.  We see no evidence of a failure to "engage in the interactive process in good faith," as Plaintiff claims.  (Pl.'s Resp. 7.)  Defendants, at all times, sought to determine how Plaintiff's cancer could best be accommodated without imposing undue hardship on him during the course of his treatment.  Defendants did not act in bad faith here.  Bjorke did not discuss alternatives to leave because Plaintiff never requested or sought to explore such alternatives.  We have yet to see any evidence that supports the argument

that Plaintiff wanted to continue working while undergoing chemotherapy.  We reject Plaintiff's claims that Dual Temp failed to provide a reasonable accommodation to Plaintiff and that they acted in bad faith.

Plaintiff not only received reasonable accommodation under the ADA; he received the very accommodation he requested.  Plaintiff's reasonable accommodation and interactive process claims must, therefore, be denied.

### D. Plaintiff's Retaliation Claim

Turning next to Plaintiff's retaliation claim in Counts II and IV of his Complaint, Plaintiff alleges that Dual Temp retaliated against him "for exercising his rights under" the ADA and PHRA.  (Compl. ¶¶ 59, 65.)  Specifically, Plaintiff claims that he was retaliated against for requesting a "reasonable accommodation" in the form of short-term medical leave, which Dual Temp granted in November 2008.  (*Id*. at ¶¶ 42-43.)

The ADA retaliation provision, 42 U.S.C. § 12203(a), states that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]."  "To establish a prima facie case of retaliation under the ADA, a plaintiff must show:

> (1) protected employee activity;
> (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and
> (3) a causal connection between the employee's protected activity and the employer's adverse action.

*Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 501-02 (3d Cir. 1997).  A retaliation claim is evaluated using a framework similar to that articulated in *McDonnell Douglas*:

> To obtain summary judgment, the employer must show that the trier of fact could not conclude, as a matter of law, (1) that retaliatory animus played a role in the employer's

15

> decisionmaking process and (2) that it had a determinative effect on the outcome of that process. This may be accomplished by establishing the plaintiff's inability to raise a genuine issue of material fact as to either: (1) one or more elements of the plaintiff's prima facie case or, (2) if the employer offers a legitimate non-retaliatory reason for the adverse employment action, whether the employer's proffered explanation was a pretext for retaliation."

*Id*.

Even assuming that Plaintiff presented sufficient evidence to establish a prima facie case of retaliation,[6] his retaliation claim fails because he has not provided any evidence to rebut Dual Temp's legitimate, non-retaliatory reason for dismissing him. Dual Temp explains its decision to fire Plaintiff largely by pointing to economic conditions in early 2009, and noting past work-related problems during Plaintiff's short tenure at Dual Temp, which made him a candidate for dismissal. Plaintiff does not offer anything beyond mere conclusory statements to support the argument that Dual Temp's explanation was a pretext for retaliation. We conclude that there are no outstanding issues of material fact regarding Plaintiff's retaliation claims. Consequently, Plaintiff cannot meet his burden, and Defendants are entitled to summary judgment as to Plaintiff's retaliation claims.

### E. Plaintiff's Claim Against Keeler and Bjorke

The PHRA forbids "any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice . . . ." 43 Pa. Cons. Stat. Ann. § 955(e). Keeler and Bjorke, as employees of Dual Temp, are implicated by this provision of the PHRA. However, non-employers, such as Keeler and Bjorke, "cannot violate Section 955(e) when there is no

---

[6] We are doubtful that Plaintiff has presented sufficient evidence to prove the required causal link between his protected activities and the alleged adverse employment action. Since his claim fails for other reasons, though, we will not explore this in depth.

corresponding Section 955(a) violation by an employer to aid and abet." *Eldeeb v. AlliedBarton Sec. Servs. LLC*, No. 07-669, 2008 U.S. Dist. LEXIS 67515, at *31 (E.D. Pa. Aug 29, 2008); *see also Kaniuka v. Good Shepherd Home*, No. 05-2917, 2006 U.S. Dist. LEXIS 57403, at *32 (E.D. Pa. Aug. 15, 2006).

Since the Court will grant summary judgment in favor of Defendant Dual Temp as to Plaintiff's PHRA claims, Plaintiff is unable to prevail on Count V as a matter of law. Accordingly, we grant summary judgment in favor of Defendants Keeler and Bjorke as to Count V of Plaintiff's Complaint.

**IV.   CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted. The Clerk is directed to enter judgment in favor of Defendants. An appropriate Order follows.

BY THE COURT:

_____
**R. BARCLAY SURRICK, J.**